May it please the Court. Scott Zarin for Appellant Appellee, Henry Hoge. I have returned, Judge. Yes, you have. There are two appeals in this case, one involving lack of good faith and the other involving attorney's fees. I will discuss the lack of good faith appeal first and the attorney's fees appeal second, and I will reserve five minutes for rebuttal. At its core, this case involves three parties, the Port Authority of Allegheny County, which set out to build a light rail system, HSQ Technology, which the Port Authority hired to build a portion of that light rail system, and Liberty Mutual Insurance Company, which issued HSQ performance and payment bonds to ensure the completion of the construction contract HSQ entered with Port Authority. Importantly, prior to purchasing the performance and payment bonds from Liberty Mutual, HSQ entered an indemnity agreement with Liberty Mutual in which, in addition to its principles, Henry and Donna Hoge agreed to indemnify Liberty Mutual for any disbursements it made on their behalf. But that obligation was only triggered if Liberty Mutual made disbursements in good faith. In this case, Liberty's – Liberty disbursed approximately $3.8 million to the Port Authority under the performance bond, the penal sum of that bond. Kennedy. Counselor, what do we know about what happened between March the 1st and HSQ went into bankruptcy in September? From the – from this record, what do we know what – was any construction on light rail during that period? From the notice in March the 1st of default, was there anything done? No. There is nothing done under this particular contract. That you shut down, then? It was shut down. As far as – The construction was shut down. Was the construction shut down? No, it was not shut down. And I will – co-counsel is here, and I will allow him to address that during rebuttal. But, Judge, I'm not sure that makes – I don't believe that makes any difference. Well, it might explain what Liberty Mutual was doing. In – It might explain – they don't have to concede that there's default. Well, go ahead. Go ahead. Our question was because part of the assertion is that Liberty Mutual unduly delayed, so that's why we were curious as to what was taking place during that interim period. I will – Isn't your contention that Liberty Mutual failed to use diligence to seek other options rather than making the penal sum? Correct. All right. So I guess the theory is that here the contractor was proceeding with performance of the contract. It received notice from the owner saying, we think you're in breach of the contract. It proceeded. And the bonding company should have, I guess, taken over the project earlier. In theory, then, the idea would be that the bonding company could have completed it cheaper than what it ended up paying. It could. I mean, it was as early as March 1st of 2001 that the bonding company was aware that there was a problem. So routinely at that point a bonding company would go in and begin to do an investigation to determine if there were a default in the underlying contract, if it could be completed for – to determine exactly how much it could be completed for, the contract price or less than the contract price. That did not happen in this case. It waited 8 months before it began any investigation, which occurred on – at the beginning of November or the end of October in 2001. In March, was that the notice of default that was given in March? What was given – what was the nature of the communication in March? In March, there was a letter sent by Allegheny to Liberty Mutual indicating that HSQ had – had – It was a kind of notice of dissatisfaction. Notice of dissatisfaction was filed. Right. So it was at that time, beginning at that time, at the beginning of March, that And what's your best case authority for the proposition that a notice short of a notice of default triggers an obligation of due diligence? What's your best case for that proposition? Well, there's no case that specifically states that, but there is case law that indicates that due diligence is a key component of the obligation of assurity. The question becomes, when is that duty triggered? The question is, in a sense, when is that duty triggered, but if – if assurity has indication that things are going awry, then if it waits until the very last minute, meaning until it discovers that – that the – that the construction company has – is in bankruptcy, which it discovered in – almost eight months later, to – to begin its investigation, then it would seem that this – that it breached its due diligence obligation in some sense. So that's the question of fact, as you see it, would be what difference, if any, would it have made if Liberty Mutual had acted more quickly? And wouldn't you have to raise that issue to avoid summary judgment? If Liberty had acted more quickly, it would have discovered earlier that the – that there were cheaper alternatives for completing the construction project. How do we know that? Well, it – it did discover that in – in November of 2001, when its own consultant, William Sarver, presented a report indicating that – that the costs were less than the penal sum of the bond. Both on November 7th, then again on December 13th, then again on December 21st, as I recall, he – the consultant that Liberty itself hired stated this – this fact. So if they had hired him six months previously to – to diligently follow what was going on in this construction project, then they would have known this – this fact. The district court also erroneously – erroneously interpreted the language of the indemnity agreement's good-faith clause to shift the burden of persuasion as well as the burden of production to the hoax of the summary judgment stage of the proceedings. At this stage, before trial on the merits, although the clause shifts the burden of production on the question of good faith to the hoax, the burden of persuasion remains with Liberty Mutual. If this were not the case, then the court would be weighing the evidence rather than simply looking for the existence of evidence on summary judgment. Such evidence weighing is the province of the jury. The burden of persuasion on what? The burden of persuasion on what issue? On the issue of good faith. I mean, in this case, what happened essentially is the district court made a – a determination that Liberty Mutual had not acted in good faith – I mean, had acted in good faith, and it was not permitted to do so at the summary judgment stage of the proceedings because there was evidence that – that a lower cost of completion was possible. So is that really an issue of burden or a question of fact? In other words, if there's an issue of – a genuine issue of material fact, it doesn't really matter who has the burden, does it? Wouldn't that issue prevent summary judgment? Well, no, Judge, because if the – if the burden of production is the burden that's shifted, and the hoax come back and produce evidence of a lower possible completion cost alternative, which they did, then – then the court should not then be looking at those completion costs and looking at the penal sum amount, the amount actually paid by Liberty Mutual, and – and deciding that the estimates submitted by the hoax were insufficient, which is what it did in this case. If the burden of production had been shifted, looking at those, the existence of that evidence in itself would have been sufficient. So there is a distinction between shifting the burden of production and shifting the burden of persuasion. The district court also erred by dismissing as a matter of law the hoax counterclaim for breach of the implied covenant of good faith in the indemnity agreement. It said that California law does not permit a party to bring an affirmative claim for the breach of such a covenant, but rather only permits a party to use this covenant as a defense to a claim for indemnification. In Cates, however, the California Supreme Court has suggested the contrary. In Cates, the Supreme Court rejected the notion that a party could recover punitive damages as a remedy for an affirmative breach of the implied covenant of good faith. In doing so, however, it necessarily implied that such an affirmative claim is available. If not, it would not have held that a punitive damages – that punitive damages are not available as a remedy, but merely that a claim for a breach of the implied covenant is not available at all. Moreover, there is no good rational reason to distinguish between good faith as an affirmative claim and good faith as a defense. If the Court has no more questions on the good faith portion of the appeal, I'll continue to the attorneys' fees portion of the appeal. All right. The case also involves the appeal of an order issued by the district court on attorneys' fees. After the Court granted Liberty summary judgment motion – Liberty's motion for summary judgment against them, the hopes requested the Court to exempt certain of their assets from attachment pursuant to that judgment for the purposes of paying their attorneys. As the basis of this request, they invoked the California Code of Civil Procedures Section 487.020, subsection B, which exempts from attachment, quote, property which is necessary for the support of the defendant who is a natural person or the family of such defendant supported in whole or in part by the defendant. The district court referred to the hopes – referred the hopes motion to a special master. Initially, that special master issued a proposed report and recommendation in which he proposed that approximately $205,000 be exempt for legal fees. Before issuing this R&R, the special master provided both parties an opportunity to comment on it. Liberty Mutual objected to it, claiming that the figure was more than the hopes had requested and that post-judgment legal fees cannot be exempt from attachment at all. To be fair, the special master then asked both parties to submit revised estimates of the hopes' reasonable legal fees. The hopes increased their estimate to approximately $517,000, providing the special master with evidence to support this figure. On the other hand, Liberty Mutual did not offer the special master anything at all. The special master then held a hearing on the matter in which Liberty failed to offer any evidence or testimony regarding attorney's fees. After the hearing, the special master issued his final R&R in which he recommended the exemption of approximately $525,000 for legal fees. Liberty objected, but the district court adopted it anyway and Liberty appealed. Essentially, Liberty makes two arguments on appeal. First, it argues that Section 487.020 does not permit the exemption from attachment of post-judgment attorney's fees. And second, it contends that even if it does, the amount of the attorney's fees the Court exempted in this case is not sustainable because the hopes should not have been given the opportunity to augment their initial estimate. With respect to the first argument, it's important to note that no court, Federal or State, has ever spoken on this issue. Section 487.020 does not – does indeed permit a district court to exempt from attachment post-judgment attorney's fees. The statute simply permits the exemption of necessaries from attachment. The pivotal question, then, would seem to be – Scalia, I'm just a little confused about who's arguing this issue. Did you appeal? We did not appeal, Judge, no. Why are you arguing this thing? Well, because we were – Doesn't the appellant usually argue the case first and you would respond? That's true, Judge, except that we were told to argue both appeals in our initial 20-minute period, so I'm doing so if the Court would prefer. It's hard to have a rebuttal argument when you haven't heard the principal argument to start with. I'm more than happy to return on rebuttal and discuss this particular issue if the Court prefers. All right. Thank you, counsel. Thank you. Did your co-counsel want to address the issue that was raised by the question from Judge Rieble before we go to – I think he might. Thank you, Your Honor. Rob Lowe, solution. I'd like to please the Court. Very briefly, the notice in March provided by the Port Authority to Liberty and to HSQ was not a formal notice of default. However, the formal notice of default issued in October 25, 2001 contained virtually – After bankruptcy? Yes, sir. After the bankruptcy on September 20th. And then Liberty Mutual acted then. Yes, sir. In fact, Liberty Mutual opened a file in March based on this letter and did nothing until after the – they received word of the bankruptcy, which was in mid-October. The work did progress between March and, in fact, all the way through the period of time that the contract was rejected. Significantly, a major subcontractor, Alstom, was hired to do 75 percent of the work. So the work – to respond to your question, the work did proceed diligently. And in fact, during that period of time, HSQ met some of the milestones which they had not met at the time – at March when they got that notice. Significantly, in the formal notice of default in October, October 25th, which was never received by Mr. Hope, who's present here in the Court, the president of HSQ. Liberty did receive that. It complained of the same problems that it raised in March, even complained of milestones that had been certified as being achieved at that time. And I think that responds to your factual questions. Thank you. Good morning, Your Honors. Good morning. I'm James Kern. I'm the attorney for Liberty Mutual Insurance Company. May it please the Court. I'm here today to address two appeals. And as a procedural matter, I'd like just a little bit of a clarification. When I checked in with the clerk of the court, I was told to address Liberty's arguments on both appeals within the 20-minute allotment. And as your Honor, yes, Your Honor, then I will proceed. I would like to address the first appeal concerning the Hogue's appeal of the judgment rendered against them by the underlying court on summary judgment. I would like to address your question concerning what was done between March and September. Specifically, the letter of March 4th, 2001, was for informational purposes only. It was not a notice of default. That's clear from the excerpts of record. Your Honor, that is correct. If we tried to do anything at that point in time, we would be here on an appeal because of Liberty's tortious interference of a contract or somehow, you know, breaching an obligation that it owed to the Hogue's, to its parent, to the company HSQ Technologies. Instead, Liberty did what it was supposed to do. First, it contacted the Allegheny Port Authority. And it said, we've received your letter. It appears this is for informational purposes only. If we're wrong, please let us know. Liberty, the next day, followed up with a telephone call saying, you know, is this for informational purposes only? The answer was yes, it was. This is clear from the excerpts of record supplied by Liberty. What was that in the excerpts of record, counsel? The excerpts of record, the confirmation that the notice of March 1st, I misspoke, March 1st, 2001, can be found in Appellee's, Liberty's supplemental excerpts of record on page 113. 113? Yes, Your Honor. And the memorandum recording the telephone call that was made can be found in Appellee's Liberty's supplemental excerpts of record on page 114. Okay. When the notice of default was actually sent out after the or at the same time that HSQ Technologies went into bankruptcy, Liberty promptly started to investigate that claim. It promptly retained attorneys to assist it with the investigation of the underlying basis of the default, including the contract analysis. It retained consultants who are familiar with public works constructions projects. You say promptly, promptly after the bankruptcy or after the March letter? No, Your Honor. After the bankruptcy. After there was actually a notice of default sent. But this morning I was looking at this case again and a page of the excerpt fell out in my lap, so I brought it with me because I was too lazy to bring the whole thing. And page 003, fifth, takeover. In the event of any breach or default asserted by the obligee in any bond, so-and-so, the surety shall have the right at its option and at sole discretion, and is hereby authorized, with or without exercising any other right or option conferred upon it by law or under the terms of this agreement, to take possession of any part or all of the work, under any contract or contracts covered by any bond, and at the expense of the principles and indemnitory, to complete or arrange for the completion of the same. Now, that is the company's absolute right. No, Your Honor. So it says. I apologize. I respectfully disagree. But that's what the general indemnity agreement provides. However, that's not what the law that was applicable to this job in Pennsylvania applied. That's not what is permissible under the contract between the Allegheny Port Authority and HSQ Technologies. Until there is a default of that contract, indeed, until there is a termination of that contract, Liberty cannot insert itself into that job. Well, let's just look at what they had the contractual right to do between them and the obligees on the bond. Your Honor, that particular contract that you're referencing is not between Liberty and the obligees on the bond. That contract that you're referencing is between Liberty and its principal, HSQ. That's the indemnity agreement. Yes, Your Honor. Okay. Between, which is the same, effectively the same people, because Mr. Holmes was one of the people involved, he controlled HSQ. Is that right? At that point in time when HSQ was actually in default in October of 2001. No, March. We're talking about March. The problem we're having here is you leap from the letter in March to the bankruptcy in September. And their contention is that something should have been done between March and September to see what could have been done differently. And they're saying that you didn't, that Liberty did not exercise their rights under this agreement in good faith by simply doing nothing. Now, what's your answer to that contention? Your Honor, my answer to that is that Liberty was not required to do anything because at the time in March of 2001, it was acknowledged that there was, that the letter was. It was claiming there was a breach. However, at that time, the owner was not defaulting the contract to HSQ. At that time, the owner was not terminating that contract. At that time, the owner was not making a demand on Liberty's performance bond for Liberty to perform. Additionally, at that time, during that whole period of time from March to September, HSQ never came to Liberty and said, we're in trouble on this contract. Please help us out. Well, I think the point that the other side is making is that Liberty had this right and it had to exercise it in good faith. And it was not exercising that right in good faith to simply sit on its hands between March and September. That's their contention. Why doesn't that have enough merit to be an issue of fact as to good faith? Because there's been a finding by the Court that until there is a fault of the contractor, which happened after March, which happened later in October of 2001, Liberty's not required to proceed. This is abundantly clear in the Court's order. So it's your position that until there is an actual default declared by the owner that Liberty has no power or authority to go in and do anything on that job? Yes, Your Honor. That is a yes under the law. Okay. Because if that were the case, what's your best case on that point? Liberty tried to assert itself. What's your best case on that point? I have not cited a single case in the brief because that wasn't an issue for the lower court. That wasn't an issue that was raised by the appellants. You know, that wasn't the critical fact that was being considered by the court. And so that would essentially be a tortious interference of the contract. That issue wasn't ever briefed. That issue was never raised. I thought you said that's the law, that you don't have the right to go in until there is a default. Yes, Your Honor. But you can't cite a case telling us that? No. I'm not prepared as I stand here today because that issue was never raised below. But absolutely that is the case. And I'd be happy to provide a supplemental authority to the court. We'll let you know if we need anything. Thank you, Your Honor. Turning now to what the court determined, that specifically the court made a determination that the record shows affirmatively that Liberty Mutual acted in good faith, even if the burden is on Liberty Mutual to show good faith. In other words, what the court determined was that even if the burden is Liberty's, Liberty met that burden, what the appellants failed to do is show how Liberty did not act in good faith. They failed to show how Liberty acted in bad faith. The critical issue that the court looked at, at that point in time, was whether the Allegheny Port Authority contract could be completed for less than the remaining contract balance plus the penal sum of the bond. What the record affirmatively shows is that after HSQ defaulted on the contract, after it went into bankruptcy, and after HSQ's contract was rejected in bankruptcy, there was no viable alternative. There was no way that contract could be completed for less than the remaining contract balance plus the penal sum of the bond. The underlying court made that determination based upon all the evidence and facts that was before it. Indeed, the court granted the appellants an additional amount of time to retain an expert, to provide a report, to show how that project could have been completed for less than the remaining contract balance and the penal sum of the bond, and the appellants failed to do that. The appellants never provided the court with any declaration, with any evidence, to show how that contract could be completed, again, for the remaining contract balance plus the penal sum of the bond. When HSQ rejected the contract in bankruptcy, Liberty was left with no choice but to pay its penal sum of the bond. If it did anything else, then Allegheny could have determined that Liberty was in breach of the bond and therefore claimed damages in excess of the penal sum of the bond. Therefore, Liberty would then turn around and ask its indemnitores, not only do we want the penal sum of the bond from you, but we want these excess amounts that are being claimed from us. At that point in the time, the indemnitores would say, wait a minute, how come you didn't settle when you had the chance for your penal sum? Here's another alternative scenario, which is, what if Liberty actually did take over and complete that project? At that point, there was no information available to Liberty that it could do so for less than the remaining contract balance and the penal sum of the bond. All the information that Liberty had available to it would have cost hundreds of thousands, if not millions of dollars more. Additionally, the Port Authority was taking control. Ginsburg. Counsel, what's your response to opposing counsel's reference to the estimates that were given that indicated that the cost would be less to Liberty Mutual? There's only one preliminary rough estimate, and that's indeed how the estimate itself identifies itself. Is that enough to raise the material question of fact? No, it is not. Why not? Because that estimate is predicated upon HSQ completing the contract. And what the lower court recognized was that if HSQ could not complete that contract, that estimate is moot. It's irrelevant. When HSQ rejected that contract in bankruptcy, it could no longer complete that contract. Therefore, any estimate based upon HSQ completing is irrelevant. That estimate that, you know, that HSQ might have been able to, you know, best-case scenario, is irrelevant. Because after that contract was rejected in bankruptcy, there was no viable alternative available for Liberty to complete that contract for less than the contract balance plus the penal sum of the bond. Indeed, all the other estimates were well in excess of the contract balance and the penal sum of the bond. The project itself was eventually completed by others for much more than the remaining contract balance plus the penal sum of the bond. Do we know that? Was that in the record? Yes, Your Honor. That's a determination made by the court in its order on summary judgment. This is an expert. Was that in the trial court's order? Yes, Your Honor. That's on. Was it? How much was it? I'm quoting on page 169 of the appellant's excerpts of record. This is on page 2 of the court's order lines 9 through 10. The record shows affirmatively.  I misquoted the lines. Here we are on, again, page 2 of the order, lines 10 through 17. It states that defendants have not presented any declarations to show how it could be completed for less than the penal sum of the bond. It states that, quote, in connection, leave was granted to defendants to file a late expert report on the subject, but defendants did not do so. Accordingly, Liberty asked this Court to affirm the district court's granting of summary judgment in favor of Liberty. I would now like to turn to the second appeal, if you don't have any further questions. On the first appeal. It appears not. Thank you, Your Honor. Regarding the second appeal related to the exemption issue, the issue before this Court is whether, as a matter of law, the appellants are entitled to post-judgment attorney's fees. And the law in question is a California Code of Civil Procedures, Section 487.020. And this code section was enacted for the specific purpose to satisfy the requirements set forth by the California Supreme Court in the Randone case. And the Randone decision related to the protection of defendants and their assets in pre-judgment proceedings. And essentially, the Court wanted to address two evils. One is the attachment of property constituting necessities of life, and two, the wrongful tying up of that property of a debtor or a defendant who is likely to be ignorant of its rights. In this case, we're not dealing with pre-judgment attachments. Well, it's necessary for them to defend the case, isn't it, as well as get ready for it. And they did. In this case we're talking about the fees. And, Your Honor, we have no qualm about the payment of attorney's fees and costs prior to the rendering of the court's judgment below, prior to the court granting Liberty its motion for summary judgment. That's not what we're talking about at all. What is the issue on appeal is, after that point in time, after Liberty then moved to seek to attach the assets of the appellees of the hoax, there was a hearing before Special Master appointed by the Court. And during this hearing, they sought to claim attorney's fees and costs for proceedings after the granting of the summary judgment. At this point, Liberty said, this is improper. We don't mind you going for pre-judgment attorney's fees and costs. The issue is post-judgment attorney's fees and costs. That's where we're drawing the line. At this point, we believe the Special Master essentially has several clear errors. First, when the hoax made their request for attorney's fees, it was approximately about $100,000. At that point, he went beyond what they requested, thought that they requested too little in some categories, didn't request anything in other categories, and increased the amount that he was going to give them to a little more than $200,000. At that point, we said, wait a minute. You're going too far. You're giving them more than what they asked for. At that point, the Special Master says, Liberty, you raised a good point. The Special Master then issues an order saying, okay, hoax, I want you to request every single thing that you can think of related to every single proceeding you can think of, whether it's ancillary or not, and we want you to assume that you're going to take these up to the United States Supreme Court and request everything that you can possibly think of to get there. We think, Liberty believes that this is clear error on the part of the Special Master. And beyond that, the hoax then estimated that we think that we've got about $517,000 in attorney's fees and costs. That still wasn't enough for the Special Master. The Special Master then, on his own, went beyond that and increased the amount to $525,454. Liberty believes that this is clear error. For those reasons, Liberty believes that the orders premised upon the Special Master's reports and for which Liberty is appealing from should be reversed and that Liberty's objections to the Special Master's report should be sustained. The only money the Special Master was talking about here was the cost to the hoax of defending against Liberty's case. It didn't have a bunch of other creditors clamoring around in the underbrush wanting to leap on them, were there? Those other costs were not included in the Special Master's estimate? I don't believe that there were any other creditors other than Liberty, yes, Your Honor. Right. So these costs relate only to defending against Liberty's claims all the way to the U.S. Supreme Court. That and other ancillary proceedings related to Liberty, yes, Your Honor. For example, a fraudulent transfer action. Right.  Thank you.  Thank you, counsel. Your final? Judge, first of all, opposing counsel makes much ado of the timing issue, which is subsumed actually in the good faith issue, and he has claimed that the district court did not address the timing issue, i.e., Liberty's failure to do anything between March 1st and September or October of 2001. Now, good faith requires due diligence in timing and the timing of the investigation as well as the assessment of alternative completion costs. Now, even if Liberty Mutual had been diligent in its investigation, in not beginning that investigation until October of 2001, that would not be enough for good faith. Good faith requires the choosing of the least expensive completion cost. Liberty Mutual did not do that. It paid the $3.8 million of penal sum without considering its own consultants' lower alternative completion costs. Now, the question of good faith itself is a factual question. When the district court rendered its decision on this factual question, that is where it erred. It erred because it decided that Liberty had acted in good faith, and therefore it decided a factual issue. Additionally, I'd like to mention that the alternative completion costs that William Sarver offered to Liberty all included $1.7 million in liquidated damages, liquidated damages that Allegheny claimed HSQ owed it for failing to meet milestones in its contract. There was never any duplication of those, whether or not those milestones had been met. There was never any lawsuit filed on them. In fact, those milestones had been met, and therefore liquidated damages were not due. And therefore, even William Sarver's estimates, which included those liquidated damages, were inaccurate and should not have been accepted by Liberty Mutual, and Liberty should have continued its investigation because the $1.7 million should not have been included in those figures. In doing so, in failing to take this into consideration, the district court and Liberty erred. Now, with respect to the attorneys' fees issue, first, I'd like to note that Liberty tries very hard to distinguish between post-judgment and pre-judgment attorneys' fees. Under the statute, under 487.020, there's no distinction made between pre-judgment attorneys' fees or post-judgment attorneys' fees. In fact, there's no indication of or reference to attorneys' fees at all. The district court said under that statute attorneys' fees were necessaries. It made a legal determination that legal fees are necessary under the statute to mount a defense against Liberty's underlying action for good faith. So it's baffling to the hoes how Liberty could read into that statute that not only are legal fees not included as necessaries, but that pre-judgment legal fees may be included as necessaries, but post-judgment legal fees may not be included as necessaries. The Randone case that says that the essentials include what's needed to litigate the pending action. The Randone case, Judge, addresses ñ was presented with the question of whether or not due process had been ñ had been given. Now, in that particular case, under the facts, they were dealing with pre-judgment fees, not post-judgment fees. So that case never addressed the issue. It never said that post-judgment fees cannot be included. The statute does not contemplate post-judgment fees. It merely said that when pre-judgment fees are an issue, notice and hearing must be given. There is no reason to assume that if post-judgment fees had been an issue in that case, the Court would have said due process was not necessary. All right. Counsel, you've exceeded your time. Thank you to both counsel for your arguments. Thank you. The next case on calendar for argument is Allegro v. Pegasus Aviation. Please approach, counsel.
judges: Reavley , T.G. Nelson, Rawlinson